Good morning, Your Honors. May it please the Court, Steve DeFilippis appearing on behalf of the appellants in this matter. This is another case similar to the one just before us that involves the standard in summary judgment. There is really no dispute as to the general standard in summary judgment. The only small dispute is that counsel has been arguing for the appellees that Dr. Cooper's declaration was excluded, and that's a different standard of review. I think that if you look closely at the Court's opinion, what the Court is doing is the Court is laying Dr. Cooper's declaration against the expert declaration of, I think it's Dr. Melnick, for the appellees. You know, counsel, speaking for myself, you've convinced me that there is a dispute between the two doctors. The concern I have, is there any dispute that Garcia dropped the gun and then picked it up during the course of the escape? Absolutely. Where is that disputed? Well, you start with Cisneros, who says he's following this whole thing. He sees Garcia stop, turn around, and put hands up. Now, those hands are there. There's no gun in the hands. Cisneros does not see that. Dawson, on the other hand — Cisneros didn't say he didn't drop the gun. It never happened the way — Well, he does not — he does not — what he says is he sees a stumble. He doesn't see Garcia go down to the ground and pick anything up. He doesn't see anything drop at that point. He sees Garcia turn around and face Dawson with his hands up. And then he's looking the other way because he thinks there might be other people out there. And then he says he turns the other way after that. But he sees the stumble, which is important because that's what Dawson talks about, is the stumble, and that's when the gun went down and he picked the gun back up. So Cisneros' version differs from Dawson's because Dawson says there was no stumble. There wasn't any stop of — I mean, excuse me, there was a stumble, but there was no stop and turn around and put the hands up at all. He denies that completely. So there's a direct conflict between Cisneros and Dawson as to what happened at the critical point. Now, remember, there was two guys in that backyard. Now, allegedly, they're going over there to — you know, according to the county, they're going over there to collect a drug debt. Now, one of the guys, Solorzano, is a second or third striker. He's got two prior serious felony convictions. So if there's somebody who's more likely to have the gun, remember, you've got some evidence in there from the father saying that — Wait a second. I thought that Cisneros testified that when he went up to check the vital signs on Garcia that he saw the gun laying on the ground. Well, you got — at that point, if I might be so bold as to say, you've got the fox in charge of the chicken coop. It wasn't Cisneros who fired the fatal shot. He wasn't the one who fired the fatal shot, but he's a brother officer there. He's lying to protect his partner. That's our position is that he's not giving an accurate version. Okay. My question is, do you have to go — I mean, maybe I took it a little bit differently, and that is I agree there's an issue of fact with respect to the trajectory of the bullet and whether he's kind of in a flee position or in a, you know, facing position or doing this thing under his armpit, I guess. Sure. If we take that as an issue of fact and then you run it through the various cases, is your position that he was fleeing? My position is he was fleeing. Okay. Now, other than your argument that he — the gun appeared magically or was planted or whatever, let's assume he has the gun. He has a gun, but he's fleeing. What's the law in terms of use of deadly force in that circumstance? Well, this Court has three cases that I think are very, very on point on that, and I've cited those in my brief. The Ting case, Kurnow and Harris, all of which involve armed individuals that end up getting shot. In Kurnow, the individual allegedly pointed the gun at the officer. Then there's a witness who says, no, he didn't point the gun at the officer. All he did was pick up the gun by the muzzle after he got shot in the back and ran out the door, and that's when he got shot by the other officers. So there was a disputed issue of fact that was found there, even though he had a gun, clearly had a gun under any of the versions, but there was a differing version as to whether he pointed the gun at the officer or whether he was simply holding the gun. Okay. So let me just stop there. If Officer Dawson's universe were the only universe, and even though he appears to be turning and fleeing, he's also got the gun somehow under his armpit, turning backwards to aim it at the officer. In that circumstance, would you agree there would be no constitutional violation in using force, if that were the only universe? Right. I think there's a disputed issue of fact. Okay. And my position is that Dr. Cooper is very crystal clear. You have a gun being shot at a flat plane. It's flat to the ground. It's going to be going in a straight trajectory to the ground. A bullet doesn't deviate to the side in a 15-foot margin, and that's the distance between the two individuals. And it hits him in the back. It's going upward at I think it was a 40-degree angle, which means he's leaning forward away from the officer, and it is slightly deviated less than 10 degrees left to right, which means that at the very most he's very slightly turned. Now, under that scenario, as Dr. Cooper stated, you can't reach around underneath your armpit with a gun and point it out so that the individual behind you sees you and be able to shoot him in the back at that angle. But I thought Deputy Dawson testified that he stepped to the right when he encountered Garcetti. He didn't testify to that. He testified in his deposition, and he never made one mention of stepping to the right. Then in a declaration, he contradicts what he said in his deposition, and he says ---- If he didn't say it, Mr. DeFleur, how could he contradict it? It would be an omission, would it not, a failure to state on deposition all of the relevant facts? No. I think that when he's saying I was running along behind him, I stopped, and I shot, that's contradictory to I stopped, I took a step to the right, and I shot. But it would be consistent if he thought that the suspect had reached down to retrieve a weapon that he might then be training on the officer. It seems to me that it would be almost an instinctive reaction to move out of the direct line of fire if you could. It may or may not be, but we don't indulge in those inferences on behalf of the appellee. Well, but the fact is that if he did step to the right, that would explain in part the trajectory issue, would it not? No. Not at all. I thought Dr. Cooper, because once that fact gets put on the table, I thought Dr. Cooper then responded to that fact. That's correct. In which case we still have a factual dispute. That's correct. Dr. Cooper responded to that and said it still isn't enough to change the trajectory. When you still have that just 10 degree or less deviation, it's not enough from just stepping once to the right. Let me go back to the stumble again, if I may. Sure. If it were undisputed that this chase was going on, Garcia stumbled, the gun fell out of his waistband, and then he stopped to pick it up and continued to run. That's when we had a videotape that showed that. It's an undisputed fact. In that event, would Dawson have been authorized to shoot to kill? No. Why not? Because there's no imminent threat to anyone at that point. Why wouldn't he be within his rights to think that, hey, in picking up the gun while fleeing, he may use the gun in furtherance of the escape? Well, that's speculation. He doesn't have to gamble with his life, does he? No, he doesn't have to gamble with his life, but he's got somebody who's fleeing from him, going away from him. Why would he stop and pick up the gun? Maybe he doesn't believe in littering. Maybe he doesn't want to have evidence left behind. Maybe it's a valuable gun. Maybe he's going to use it in furtherance of the escape. Why should the officer have to wait and be shot at to see which of those is true? Because that's the law. What case says that? What the law says is that the mere fact that somebody has a weapon does not make them an imminent threat to others. Agreed. But if you stop in the middle of a pursuit, pick up a gun, and then continue, that's a little different, isn't it? That's what Carnow did, even under the witness's version. He stopped and picked up a gun in the middle of the pursuit. We got reversed in Hagen v. Brousseau because we didn't grant qualified immunity where a felon was continuing a flight and the officer tried to stop him and all other means failed and she shot him. And the Supreme Court said no in those circumstances where there is a potential danger to others by virtue of the conduct of the fleeing felon, the use of deadly force is appropriate. But you don't have any conduct. So why is that different from the situation that confronted Deputy Dawson? Here you don't have any conduct. I mean, first of all, possession of a firearm is not in and of itself illegal, and there's nothing known to the officer that indicates that in and of itself it's illegal. What Garcia and Solorzano are doing at that point that the officer sees, they're misdemeanors. They have committed a trespass onto somebody else's property. How was the call originally dispatched? I didn't see that in the record. It was dispatched as a trespasser. As a trespasser. Two people are on my property and then he calls back ten minutes later, there's no cops here yet, I'm worried. They have a gun. I don't believe he says he has a gun. I don't think that's borne out by the record. I thought the homeowner talked with the deputies on their arrival and told the two deputies that he thought they might be armed. Well, under Scotch, you have to closely examine the officer. He's the only one who's said that. There isn't any claim on behalf of the homeowner that he said that. So the homeowner doesn't testify to that now? No. Okay. But the deputy says that's what he told me when I got there. It's the officer's statement. Okay. And then how about the ‑‑ I didn't see any toxicology reports. What did the tox screen show on Garcia? I'm not sure if that was part of the record at the summary judgment or not. I assume that they took blood, urine. I know that they did. I believe that, you know, there may have been some present, but I'm not ‑‑ It said he was intoxicated on methamphetamine. Methamphetamine, wasn't it? Memory doesn't serve me well on that. I have a vague recollection of there being some indication of that to either methamphetamine or cocaine. To what? Given the timing of when we're evaluating this. I'm sorry. What's that? I mean, does it matter? No, it doesn't. I mean, there's ‑‑ the officer doesn't. The evidence might be consistent. Well, but is there any evidence that on either side where the officer said he thought he was? No. The officer never said that he believed he was under the influence and, you know, was ‑‑ I grant you. But doesn't it also corroborate Dawson's observations that the man is acting in a way that's consistent with someone who is high on something? Which might include picking up a gun that he dropped during the chase when any other rational person would realize he picked that gun up and the police are going to shoot. And, well, of course, there's still a disputed issue of fact as to whether he picked up the gun or not. No, no, no. You're missing the point of our questioning. Our questioning is that presumably if we grant your appeal and we send it back for trial, the jury is going to hear the results of the toxicology test because it's certainly relevant that Mr. Garcia was hopped up on something. And I assume there will be expert testimony to the effect of what a person is likely to do when high on methamphetamine. Except that there wasn't here on the summary judgment motion. No, I understand that. But this is all relevant evidence to explain Garcia's conduct at the time that he encountered the deputies. No question about it. But it can't be used to create a triable issue or to create the lack of a triable issue of fact at this stage. In other words, what I'm saying is... You said there was none of this before the district court at the time on summary judgment? I can't say that. I can't say one way or the other whether it was before the district court. You can ask, I'm sure, counsel for Santa Clara County will clear that up for us. I'm sure he will. But in any event, whether it is or isn't, there may be an explanation if you had an expert that was giving an opinion on that. But there isn't at this point. And all of the facts are disputed as to who possessed the gun. It's the plaintiff's position in this case that Solorzano was the likely one who had the gun. Is it enough on summary judgment for the plaintiff to say, I'm going to come in, I'm going to cross-examine the living daylights out of Solorzano, and I'm going to show that because he's a scurrilous felon with a lengthy record that he can't possibly be telling the truth on that score? Does that create a contested issue of material fact? Is that enough on summary judgment? Well, you're going to have evidence that Garcia was unknowledgeable about weapons, that he didn't in the past possess weapons, that he wasn't someone who owned weapons. You have Solorzano who has two prior violent felonies in his past. He's a third-strike candidate. He flees from the police and stays away for a period of time after this because he's concerned about two things, one being a third-strike prosecution and the second being that if he was involved in going over to break into the house and collect some drug debt, that's a burglary, and a burglary and somebody getting killed in it, it's a first-degree murder. So he had a lot of things to worry about in terms of motivation for why he would put the gun in Garcia's hands. I hear all your evidence of impeachment, but I don't think you've answered my question, which is under our case law, is that enough to defeat summary judgment, to simply say, well, Your Honor, if you give me a trial on this issue, I'm going to show these guys are all lying? Well, you have to under Scott, you have to look critically at the evidence because of the fact that, I mean, we have a dead, our witness is dead. We're stuck with having to deal with everybody else's facts and none of our own. But we have. We did that and we found the officers were entitled to qualified immunity, didn't we? Yeah, but that was a different circumstance. As I recall, Scott, he got a report of a man acting crazy. He's firing shots. They go over there. He comes outside. He points a gun at the officer, and I don't think there was a dispute as to whether he had actually pointed the gun at the officer. So under those circumstances, I think no matter how you look at it, critically or not, an officer has a gun pointed at him. He's going to be entitled to shoot. But that's the dispute in this case. And the dispute in this case goes even further as to whether the gun is possessed. And I think you have to give us the benefit of the doubt on those issues in order to. And am I right that this whole thing happened literally within less than two minutes from the time the officers announced their arrival at the crime scene? You know, it's hard to tell because you've got some discrepancies in the timeline. We've got the tape from Santa Clara County Communications, don't we? But you've got. We know when the officer announced his arrival at the scene. We know when he announced that he was in foot pursuit. And we know when he called for fire and ambulance and that a man was down, don't we? Isn't that all on tape, on real time? I don't remember if the tape was ever submitted in the summary judgment. I don't believe it was. You didn't get the tape from. My recollection is that this was done by a declaration of the custodian. I thought I saw a declaration that actually talked about a minute, minute 47. The times are in the record, are they not? Yeah. Stating the. . . but that's per a declaration of the. . . Who's reviewed the tape? I mean, it's essentially. . . Yes. There's nothing to dispute those times, correct? There's nothing to dispute those times, but there is something to dispute about the gap between that and when anybody's finally let into the scene almost 35 minutes later. Sure. But that goes to the medical deprivation claim. I guess what I'm trying to get straight here is that all of this happened literally in a matter of seconds. Well, I think that's probably correct, that it did happen in a matter of literally seconds. But then there's a big gap, and during that gap, remember, Dawson is in control of the crime scene. I mean, he's the guy who caused the homicide, and he's been left in charge of the homicide scene by himself. And then Cisneros is there, and Cisneros is his partner in this matter, and you've got the two of them in charge of the homicide scene, and a long period of time elapses before they let anybody else into that scene, and a lot of things can happen. Kind of in my mind, it really boils down to one thing. I don't think there's a substantial risk of harm to others, given who's in the vicinity or not in the vicinity. It really comes down to whether or not the officer reasonably believed there might be a risk to him. And if they have the factual issue, which seems like everybody agrees there's definitely a factual issue, no matter how it's resolved, what's your best case for saying, even if he has a gun and is fleeing? I mean, I guess your theory is that he has no gun and he's fleeing. But let's say there's nothing to permit that inference, but so the inference is he has a gun and he's fleeing. What's your best case to say that's not a potential risk to the officer? Well, there can be two different scenarios under the has a gun and is fleeing. Has a gun in his waistband and he's fleeing and he never drops it and picks it up, or that he drops it and picks it up. And my position is that under either of those scenarios, if he's not using that gun in some fashion and there's no indication from past actions that he's taken, such as having committed a violent felony, there's no indication of him using that gun to endanger anybody, there's no basis for simply shooting him at that point. So the mere possession of the gun by a fleeing felon is not sufficient to invoke deadly force, then? It's a matter of law. That's correct. Suppose he were to have yelled to his compadre, hand me a gun, and keeps fleeing. Would that change it? That might change it in certain respects. I mean, if his compadre was right there close to him, give me a gun. What's the difference between give me a gun and stopping to pick up a gun? Well, he drops something and he's stopping to pick it up. So just a tidiness kind of thing? It's a little more than a tidiness type of thing, but, I mean, certainly if you're going to characterize him as a criminal, and I don't agree with that characterization of this young man, but if you're going to characterize him as a criminal, a criminal is going to value the possession of that gun. Are you disputing that he went over to the house to collect drug debt? Frankly, it's my position that Sol Rezano had the gun, not him. No, no, no, no, no. The question is, you said he's not a criminal, but I thought we agreed at a minimum he was a trespasser, and that, in my book, I think, is still a crime. Well, it is a crime, but I've got to confess. In your words, if he went over there to collect drug debt, it was a burglary, which is a felony. That's not my words. That's what the government is saying that they were going over there to do. Tovar doesn't acknowledge any drug debt. So what's your evidence going to be at trial as to why your client was hanging around in the backyard of these folks' home? He's going over to Tovar's house because Tovar owes him money, but not as a result of the drug debt. I see. Okay. So, all right. Okay. Okay. Thank you very much. Thank you. For the county, please. Good morning. I'm Steve Schmidt for the defendant appellee's deputy sheriff's deputy, Seth Dawson, in the county of Santa Clara. It's undisputed in this case, and this is a de novo review and a summary judgment, obviously, the one issue that's not de novo would be we believe would be whether the opinion of Mr. Cooper was excluded by the trial judge in this case. I believe it was, and I believe so the standard for that decision would be abuse discretion. Point me in the record to where you think it's excluded. Well, we filed a motion to strike Mr. Cooper's opinion, and that can be located at page 572, excuse me, 575 and 577 of the transcript. Now, there is no separate express ruling that the judge made. He did indicate in his order, and I don't have the order handy, but it's the same. I have the order handy. He indicates in the order that he has indicated that the opinion of Mr. Cooper is speculative. And under Federal Rules of Evidence 702, unreliable speculative evidence should be stricken, should not be considered. But he goes on to say, then he basically tries to say why it doesn't resolve what he failed to take into account. So if it's not stricken, then he's weighing the evidence, correct? Yeah, but he's a trial judge, and he's an experienced trial judge, and I think he knows he's not supposed to weigh the evidence on a summary judgment motion. I thought you were saying he basically excluded it because it was speculative under a rule, and therefore didn't consider it. I believe he did. I believe he did. And I believe that's the only reasonable inference from reviewing his order, because he's not going to weigh the evidence because he knows he's not supposed to weigh the evidence on a summary judgment. Well, you can say he's not supposed to weigh the evidence, but he didn't grant your motion, and he talks about it, and then he weighs the evidence, it seems to me. Okay. Let's talk about it under an abuse of discretion standard. Even if the standard is abuse of discretion, how can you – he's basically weighing the evidence to say it's speculative. I mean, it's not – he's not excluding it because it has no foundation. If you look at when you – he's not excluding it because of the expert's – expert qualifications. He's not excluding it because it has no foundation. He's excluding it because he doesn't think it explains everything. How is that speculative? He excluded it because it was a coin flip opinion. What he did was he took a fact that is undisputed in this case, and that is that the trajectory of the bullet was straight through the back. I mean, that's undisputed. All the experts agree upon that fact. What he did was he took it one step further and assumed that because of that, you have to assume that he was running away, he wasn't turning to shoot, and therefore, in my opinion, there was no grounds to shoot him. And that opinion is pure speculation because he doesn't have any foundational facts to show what position the two men were in at the time the shot was fired. If you look at the record, Dawson testified that when the man stumbled, he had a view of his right side, which means he's not right behind him. He's looking at him at the side. And all this conjures up to me two shooting experts, so to speak. You know, for example, here's a question. He says he didn't take – his report didn't make mention of the fact that Dawson took a step to the right. Right. Okay. Was – did he – didn't he in his deposition testify about that? Or his declaration, Dr. Cooper? Doesn't he actually give an opinion of whether or not his opinion would change if Dawson – He talked about that. Of course, that was after the summary judgment motion, and after – before the ruling of the summary judgment motion, when I was deposing Dr. Cooper in preparation for trial, the ruling came down later. I'm not sure if that's before the court. Right. But Dawson doesn't put that in his original report in any event, correct? He adds it later. No, he doesn't, because – and the plaintiff – excuse me, the appellant in their brief argued that he had never said that before, but in fact, he had said that before, and it's in the record, and I'll give you a citation to that. Okay. It's – there's an exhibit that was offered by the appellant. It's the Shooting Review Board report, and it's located in the excerpts – the appellant's excerpts at page 144. It was a report dated October 10, 2001, within 20 days of this event, where he indicates in that report he reportedly said, I stepped to the right and shot. So that was – the first thing he ever told anybody that was a matter of record was that he did that. And the reason why he didn't say it in his depo, because he wasn't asked, did you step to the right. And so, you know, it's – you know, if there's a problem with him omitting the depo, it has – it has something to do with the matter in which he was questioned at the deposition. Let me ask you this, Mr. Schmidt. Suppose we assume for the sake of argument that Dr. Cooper's opinion should have been accepted. So we have Dr. Melinek on one hand, Dr. Cooper on the other hand, or at least Dr. Cooper contradicting what Dawson said. Let's just assume for the sake of discussion that's the way it plays out. Is that the end of the ballgame? I don't think so, but Dr. Cooper's opinion could have been rendered by me. I could have said, hey, the bullet went straight through the back. It's obvious the guy was – he was running away. He wasn't turning. I mean, anybody could make that deduction. That's not an expert opinion. Well, I mean, this wouldn't be the first time you find an expert who says what the person is paying him to say, you know, says what he's paid to say. But that's not reason to grant, you know, to throw it out. If he shot in the back, directly in the back, it doesn't mean he wasn't threatening with the weapon. It doesn't mean that we still have – and renders an opinion, and – but you're really fighting my facts. I'm saying suppose we say that for whatever reason Dr. Cooper's opinion is sufficient to create a factual dispute about the turn. Okay? I know you don't buy that, but just for the – Hypothetically, just assume that his opinion is – It's enough to raise a material question about whether he was turning or not to dispute Officer Dawson's testimony. Let's just assume that. Okay. Is that the end of it? No, it's not the end of it because there's still no triable issue of material fact as to whether or not the objective – the conduct of the deputy who shot Dawson was objectively reasonable because we still have a situation where it's undisputed that this man appeared on this property and was scaring the living daylights out of the people who lived there because he called twice. Your version or Dawson's version is that as the chase progressed toward the end, Garcia stumbled, his gun fell from his pants, and picked it up and – Right. He was apprehended. Is that – is there anything to dispute that rendition of the facts? Nothing. There's a 14-second delay from the time he encounters him until the shooting occurs, and in the very last split second is when he stumbled as he got – he's trapped. There's two fences there. He's got nowhere to go. He's trapped. The deputy's on his tail. He knows it. He's running away. He knows he's guilty about something. And what does he do? He stumbles. The gun falls out. What does he do? Does he give up at that point? No. He picks up the gun. He picks up the gun and he makes a move. Okay. And both Cisneros and Dawson testified to that fact. There's nothing to refute it. Counsel talked about the Kurnow case. In the Kurnow case, you had an eyewitness who was right there and said he didn't go for that gun until after he was shot. We don't have that here. We don't have – I guess the dispute comes as to whether he was twisting and aiming backwards at the officer. That's the dispute, correct? No dispute there. If you take Dr. Cooper, you don't have to believe him, but he raises an issue that that's not – that that fact is disputed, doesn't he? Well, I mean – You've got an officer. You've got an officer with a record that is not, you know, the most charitable one to go to trial with. So we take him as saying what he says is true. But wouldn't Dr. Cooper, if you just take it at face value – and I know you don't agree with him. I'm not asking you to agree with him. But doesn't he dispute Dawson's rendition of this twisting around and putting him in jeopardy? You know, I don't really understand the question. Could you say it again, please? Let me try it again. If you have Dr. Cooper's testimony that says it's really not possible to do physically, given the way the trajectory of the bullet is, it's not possible to have the events occur as the officer testified to. Well, I mean, if we were to believe Dr. Cooper, you know, I suppose you could still have a scenario where a gun was being moved. I mean, if you're standing directly away from a deputy and he tells you to stop and you reach down and pick up a gun, your back is still to him. You're not turning. And the testimony is stop what you're doing. What does he do? He picks up the gun and he moves with the gun in this direction. At that point, I don't think the deputy in this situation has to wait any longer. There's a firearm. It's being moved. He's disobeying commands. He's trapped. I mean, at that point, how much longer does he have to wait before he protects his own life? So I don't think Dr. Cooper's opinion steers it away from the validity of the ruling at the trial court level. So I guess your argument has to be that notwithstanding the dispute, if there is one, if Dr. Cooper's opinion is admissible, properly considered, that once he disobeys the officer's command to halt and he stumbles and then reaches down and picks up the gun, at that point the officer is in reasonable fear of his own life and he doesn't have to wait for Garcia to make any other kind of threatening move before he's authorized. Judge Tomlin seems to have eloquently stated your case better than you have in terms of Dr. Cooper's opinion. Yes. Well, the actual yes. Thank you. Well, I mean, in reading the Supreme Court cases, I don't know if that was a compliment or not from my sister here, but in reading the cases, it's very difficult to discern from the Supreme Court of the Ninth Circuit cases at what point the officer is free to fire. I mean, there is some language, I agree, in some of the Ninth Circuit cases where, you know, it seems to suggest that unless the gun is actually being pointed at the officer and the suspect has his hand on the trigger, that it is only and there wasn't enough time to warn the suspect that, you know, drop the gun or I'm going to shoot, that the officer can't employ deadly force. Well, you know, there's a Billington case, which was a case where it was an off-duty deputy who was chasing somebody, a car chase, and they got into a fight. And in that case, there was a disputed fact that at the time of the shooting, there was a witness who said that the suspect in that case had got his hand on the deputy's gun. And then a witness who was, this is what the deputy who shot said. An eyewitness said, no, his hand was not on the gun. So there was disputed fact on that point. But the Court held summary judgment was proper because it was clear to everybody who was there that the guy was giving the deputy a really hard time physically and they were in close quarters. So he was justified in using his gun at that point because he could have got the gun at any moment. That makes sense. If we kind of break it up, I think the difficulty I'm having is the one Judge Tallman alludes to, and that's this sort of interim. If the guy's pointing the gun, no doubt, there's no question about the risk to the officer. If he has a gun and he's literally running down the street, would you agree that, assuming there's no risk to other people in the imminent, you know, imminent danger to others in the vicinity, that he wouldn't be a risk to the officer if he's just running down the street and he's fleeing? Well, that's interesting because the Garner case was a youth who had just committed a burglary and was running away, was unarmed, and the deputy said halt. He didn't halt. He shot him in the back of the head. Right. And clearly, that is a violation of the Fourth Amendment. That's a violation. Okay. Now, if you put a gun in his hand, okay, that's one set of facts. You put a gun in his hand and you put a fence right in front of him and you're chasing him right into that fence. I mean, at one point, at one point, pardon me? How about you put a gun in his hand, he drops the gun and then reacquires the gun? And that's what happened in this case. Actually, he said stop after he went to pick up the gun. If you look at his statement, Dawson's testimony was that he saw him go for the gun, said stop, and the guy continued to pick up the gun and make a move. And, of course, Dawson's testimony was like this. Cooper says, oh, no, that couldn't happen. But neither one of them, Cooper's testimony or expert opinion cannot refute the fact that there is eyewitness testimony that he had a gun and that he made a move with the gun and even Cisneros backs that up. So, you know, and I know dead men tell no tales. And Scott Behinrich says you've got to look closely at the circumstantial evidence. I know that's what you're going to do. And I think, you know, Judge White recognized that and he attempted to do that as well. Would you agree that what it boils down to really is the risk to the officers and not a risk to the public or others in the vicinity in this particular case? In this particular case, there is no evidence that there was somebody standing on the other side of the fence that could have been a victim. That's true. So you're really looking at the officer and Garcia? Yes. I, you know, I think the fence. When you're trying to parse the cases, then we take those handful of cases that have fleeing suspects and we have to figure out is this, you know, four square within them or enough within them or, you know, that's really what we're trying to do. I think the fence is the key factor here because what the fence signifies is that the moment of truth is coming very rapidly. It's not like this guy's running through an open field and he's got a gun, but you're trying to catch up to him and he's running away, so there's still not as much fear. But once there's a fence there, anybody's going to know, boy, he's got a gun. I've got him trapped. What's going to happen next? And as soon as you see that gun move, how long do you have to wait until you see the barrel pointed right between your eyes and then and only then can you use deadly force? I don't think that's fair. And the case law talks about Monday morning quarterbacking not being the right approach here and 20-20 hindsight's not applicable. So you've got to give some deference to the fact these things happen rapidly involving in the heat of the moment and under those circumstances, I think in this case, I can't imagine a set of facts that would go to a jury that would result in a plaintiff verdict that wouldn't be overturned by your honors. Well, it depends on the panel. Without being too cynical. Can you answer the two questions? Can you answer the two questions that I posed to Mr. DeFilippis about the toxicology report and the test results? There was evidence in the record from page 68 of the excerpts, which is the affidavit from the coroner where she indicates that the toxicology testing on the decedent indicated high acute amounts of methamphetamine. I mean, it's undisputed that he was on meth. This was 9-11. This was a day where everybody else is glued to the TV set, and about noontime, this guy decides to go collect on a drug debt. So, I mean, I think clearly now meth was not known to the deputies, but what was known to the deputies was now what was the other point you wanted me to make? The time sequence. Is there any? The time sequence. That would be the affidavit. Well, it would be Dawson's affidavit, but it would also be the affidavit of Lori Brown, who's the county comm dispatcher, and it's page 69 and 70 of the excerpts. And she says that, yeah, there was a 14-second lapse from the time that the deputy notified on his radio in foot pursuit until shots fired and then immediately thereafter called paramedics. And that, by the way, that tape has been turned over in discovery. It's in the possession of the plaintiffs. So she got the times off of the real-time tapes, the communications tapes? Absolutely. There is a tape. Does the toxicology report matter, though? Is there any evidence? Because we're backing this up to a reasonable officer at that period of time. Is there any evidence of erratic behavior or something that we might infer that he's a little crazed on drugs? I agree with you that the deputy couldn't possibly know the results of the toxicology test. Not the results, but is there any, the conduct is what I'm looking for. Well, what the deputies knew when they got there was that there had been two calls, that the TOVAR was scared and thought they might be armed. And there's evidence of that in the record. And that when they encountered these two guys, one of them complied with their request. The other one took off, and that's the guy that, that's the decedent. So he, at that point, he did not want to have anything to do with those deputies, which clearly shows guilt and clearly shows that he's not going to cooperate. And then, again, his conduct at the fence, when the gun spills out and he drops it and the deputy is saying, stop, and he picks up the gun, you know, at that point, he's behaving in a way that is so unpredictable that. What you're saying is really that it's circumstantial corroboration after the fact of what Dawson says. The method, yes. Yes. It's corroboration. It couldn't possibly have been in his head, but I think there's plenty. He didn't know about it, obviously, but it doesn't give the lie to anything that Dawson said. If anything, it helps support Dawson's version. Right. It explains the conduct of this guy. I mean, the evidence is that he was, you know, he was a mixed-up kid, but, you know, and maybe this explains why he was behaving the way he was, because he clearly had a gun. That's undisputed. So I have a minute left. I'm not sure. If there's something else that you want me to address, I'd love to do it. Otherwise, I think I've made my points. Do you want to hear on the 14th Amendment claim? Okay. Thank you. Thank you very much, Mr. Chief. Thank you. Could we pause for a minute? Sure. I know I did use up my time. I'm happy to give you it. I appreciate that. The declaration of the Laurie Brown states that 10 minutes later, a second 911 call was made by the same reporting party, inquiring when the officers would arrive because he was scared. There's no mention of a weapon. You know, the drop and pick-up of a gun is disputed by Cisneros. Remember, we talked about it at the beginning. I didn't hear you say it was disputed by Cisneros. I didn't see anything that Cisneros says, no, it didn't happen that way. Well, Cisneros sees the stumble and Dawson sees the stumble. They only describe one stumble. Each of them describe one stumble. And at the stumble that Cisneros sees, Garcia gets back up, turns around, puts his hands up, appears to be surrendering, and that's when he turns away and then the shooting occurs. He never sees the pulling out of a gun, the turn, the tucking the gun under the arm. He never sees any of that. That's only Dawson that sees that, according to his statement. So Cisneros has seen the stumble. Dawson sees the stumble. Dawson has a different story about the stumble and what happened than Cisneros has. And that, I think, creates a triable issue of fact as to whether there's even a drop and a pick-up of the gun. So if that's the case, and even if he does have the gun, even if you assume the gun's still tucked in his waistband, it's not out, it's not known to the officer at that point. If he's running away from him, he's not seeing that and he's not acting upon it. But Cisneros testified that he looked the other way and so he couldn't have seen the brief time it would have taken for Garcia to reach down and pick up the weapon. But either way, he just sees one stumble. And Dawson only describes one stumble. It has to be the same stumble. Right. And I think for purposes of summary judgment. And then there's a shot and Cisneros approaches and he sees the gun on the ground. But Cisneros sees a different scenario with the stumble. He sees the stumble followed by the turnaround and hands up with nothing in the hands. So that differs from what Dawson says about the stumble and what happened as a result of that. Because the stumble is critical because the stumble is where the gun allegedly falls out. It's where he reaches down and picks it up and then he tucks it back in his hand. And that differs from what Cisneros says. Okay. Thank you very much. Thank you. The case, Mr. Arkey, to submit it will stand in recess for today. Thank you. This Court, this session stands adjourned.
judges: Silverman, McKeown, Tallman